SOPHIA WAGNER, as Administratrix of the Estate of NICHOLAS WAGNER, Deceased, Appellant, *v.* THE NEW YORK, CHICAGO AND ST. LOUIS RAILROAD COMPANY, Respondent.

*Wagner* v. *N. Y., Chicago & St. L. R. R. Co.,* 100 App. Div. 512, affirmed.

(Argued October 26, 1905; decided November 21, 1905.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered January 19, 1905, affirming a judgment in favor of defendant entered upon a verdict directed by the court.

*George E. Towne* and *W. S. Thrasher* for appellant.

*Louis L. Babcock* for respondent.

Judgment affirmed, with costs; no opinion.

Concur: CULLEN, Ch. J., GRAY, HAIGHT and WERNER, JJ. Absent: O'BRIEN, J.

BARTLETT, J. (dissenting). This action has been three times tried. The first trial resulted in a verdict and judgment in favor of the plaintiff, followed by a reversal in the Appellate Division; at the second trial the result was the same; at the third trial the record of the second trial was deemed to have been read to the jury, and thereupon the trial judge directed a verdict for the defendant, and a judgment was entered dismissing the complaint on the merits. The opinion of the Appellate Division reversing the first judgment is reported in 76 Appellate Division, 552; the opinion reversing the second

judgment is reported in 93 Appellate Division, 14; no opinion was written by the Appellate Division in affirming the judgment from which this appeal is taken.

As this appeal is from a directed verdict against the plaintiff, she is entitled to the application of the rule that "in determining the correctness of the decision, the party nonsuited, or against whom a verdict is directed, is entitled to the most favorable inferences deducible from the evidence, and all contested facts are to be treated as established in his favor." (*Higgins* v. *Eagleton*, 155 N. Y. 466; *Ladd* v. *Ætna Ins. Co.*, 147 N. Y. 478; *Weil* v. *D. D., E. B. & B. R. R. Co.*, 119 N. Y. 152; *Rehberg* v. *Mayor, etc., of N. Y.*, 91 N. Y. 137; *Waldron* v. *Fargo*, 170 N. Y. 130, 133.)

This action was brought to recover damages on account of the alleged negligence of the defendant resulting in the death of plaintiff's intestate. The defendant company is familiarly known as the "Nickel Plate," and operates a railroad extending from the city of Buffalo westerly through the counties of Erie and Chautauqua in this state and thence further west. The accident resulting in the death of the plaintiff's intestate occurred on the 16th day of April, 1901, at a point near Idlewood, in the county of Erie.

The intestate, Nicholas Wagner, was a bridge carpenter and worked much of his time with gangs of workmen engaged in part in the repair of old bridges and the erection of new ones; he had been in the employ of the defendant some ten or twelve years. Immediately prior to the accident the defendant had caused to be erected and completed a new bridge spanning a ravine seventy feet deep, more or less. The gang of workmen, of which the intestate was one, was engaged on the day in question in clearing up refuse material under and about the newly constructed bridge, consisting of timber, iron, stone and other bulky articles. This work was accomplished by placing a derrick car, on which the intestate worked the day in question, and a gondola car on the bridge; the derrick raised the material and swung it over the gondola car upon which it was unloaded. This work had proceeded during the forenoon of the day in question and many loads of material had been elevated and deposited in the gondola car without

interruption or mishap. During the afternoon and as the work was nearing completion, there remained to be elevated four large cap stones which had been a part of the old bridge abutments. Three were raised without special incident, but while raising the fourth one, which was lying about seventy feet below the derrick car, the accident happened. This stone, owing to its great weight, five thousand pounds, caused the derrick car to tip over and fall into the ravine below, carrying with it the gondola car. The intestate was killed; one other man was fatally injured; the engineer on the derrick car, a laborer on the gondola car and others were more or less severely injured. This brief outline of the accident will render more easily understood the questions of law and fact involved.

The questions of law are: (1) Did the defendant furnish the plaintiff's intestate a safe place in which to work; (2) was Isaac Cole, the superintendent of bridges, under whom as such official this work was conducted and superintended, the *alter ego* of the defendant; (3) was the defendant negligent; (4) was the intestate free from contributory negligence; (5) did intestate assume the risk of the car tipping over. The Appellate Division on the first appeal held that the omission of the defendant's superintendent to anchor the derrick car to the track was the negligence of a fellow-servant, and such act was a mere detail of the work; also that the law of safe place was not involved. The Appellate Division on the second appeal held that liability on the part of the defendant could not be predicated upon the fact that a turnbuckle and chain were not in the derrick car on the occasion of the accident, as proper ropes for the purpose were there; also that the intestate was guilty of contributory negligence, and that he assumed the risk of the accident.

A more detailed statement of the facts is necessary at this point. The body of the derrick car was similar to the ordinary flat car, on one end of which was erected the derrick and on the other a shanty, so called, that was built over the machinery, which consisted of an engine and boiler and a wheel similar to a ship's wheel used for steering, a device to control the boom of the derrick. This shanty was about

twenty feet long and seven feet in height. It was erected just back of the mast of the derrick. The shanty had two doors and a window in each end and at the side. In this shanty worked the engineer and the intestate, called the crane-man, whose duty it was to operate the wheel controlling the boom of the derrick. The record contains pages of description as to the manner in which this derrick car and its machinery were constructed and operated. But a few more facts will suffice to a clear understanding of the situation. The mast of the derrick was twelve feet in height; to the bottom of this mast was attached a boom about twenty-four feet long, running up at an angle of about forty-five degrees to a point that would bring the outer end of the boom opposite the top of the mast; from that point to the upper end of the boom was a horizontal beam securely fastened at both ends. The mast, the boom and the beam were firmly fastened together as one common structure, and the only way of operating the boom was to revolve the mast when the engine was running.

There are but two witnesses able to relate what occurred in the derrick car during the last two or three minutes prior to the accident. One is a witness for the plaintiff named Cameron, who worked on the gondola car, and Eddy, the engineer of the derrick car. Cameron testified that while this fourth stone was being elevated he could see the intestate through the window of the shanty, and that he was at his post of duty with his hands on the wheel until the car began to tip. Eddy, the engineer, who was sworn by the defendant, and was then in its employ, referring to the raising of the fourth stone which caused the accident, testified as follows: "We lowered away our rope and fastened it to the stone below; while they were doing that I stepped to the door and looked out; I stepped back and asked Wagner" (the intestate) "if it wasn't a good plan to anchor the car. He stepped to the door and looked out and then he stepped back and looked over back of the engine; he said, 'I don't see any chain.' I said, 'the only chain we have got is below with the stone hooks;' and at that we heard them holler to go ahead, and with that I started the engine." On cross-examination this witness testified: "Wagner" (the intestate) "looked for

the chain just before we started the engine; when I said something about it, then he looked around for the chain, but we hadn't commenced to lift the stone then. I said something to him, and he looked around for the chain. There wasn't any there." This witness further testified, in substance, that while the stone was being raised the engine commenced to "stall," and that he did not discover that the car was tipping over, but turned to look at his steam gauge and found that there were sixty-five pounds; he remembered that distinctly. He then states: "That wasn't more than half a minute, a few seconds before I lost consciousness. The observation which I made of my steam gauge is about the last thing I can remember."

It is apparent that this colloquy between the intestate and the engineer could not have been more than a minute or two before the accident, and there was no time to anchor the car and no appliances were present. While there is a conflict of evidence as to whether those appliances were present or not, the plaintiff, under the rule of a directed verdict against her, is entitled to have the facts settled in her favor that no appliances were in the shanty.

It is proper at this point to consider the condition of the record under the rule in question as to the presence of these appliances in the shanty at any time during the day of the accident. It was clearly proved by plaintiff that the chain used by the workmen seventy feet below the derrick car in raising the stone causing the accident was the chain *always* used in anchoring the car. It appeared that there was a large hook on each side of the car; to this was attached one end of a turnbuckle and to the other end thereof was secured the chain, and the latter was fastened to a girder of the bridge, or some other object of sufficient stability to hold the car.

There is a conflict of evidence as to whether there was not hanging in the shanty that day some two hundred feet of an old inch and a half hoisting rope that had been badly chafed and pronounced unsafe for use on the derrick; also some tag lines that were smaller and not used for anchoring the car. There is, however, a witness who swears that there were neither turnbuckle, chain nor ropes in the shanty on the day

in question. Cameron, the foreman, also testified as follows: "There was not any appliance for fastening the car down there on that day, and when I speak of appliances I mean chain and turnbuckles. There was neither chain nor turnbuckles; there was an old running line in the shanty, a hoisting line; we called them runners, which was chafed and badly worn. Its previous use had been for hoisting; that is, a line that had been in use on the same car or on this derrick, but not on this job; it had been taken out. Our foreman thought it wasn't suitable; I have already stated that the design and use of this rope was a running line or lifting rope. It must have been between two and three hundred feet long; it was badly chafed and worn out. It was about an inch and something, but had been worked down so that it was about an inch line; it was a manilla line; it was badly chafed and worn." Superintendent Cole, when on the stand, testified under cross-examination in regard to the alleged tag lines as follows: "I do not think those half-inch ropes" (the tag lines) "would be suitable to anchor down that car with; neither of them." One of plaintiff's witnesses swore, as already stated, that a chain was *always* used in anchoring the car, and Cole, the superintendent, admitted under cross-examination that the rope had only been used since the accident for the purpose of anchoring. The rule in plaintiff's favor establishes the facts as above stated.

It is also a conceded fact that the usual mode of operating this derrick was to allow the boom to stand parallel with the track, and that such was its position during the prosecution of the work the entire morning of the day of the accident. It appears by one of plaintiff's witnesses that up to the time the large fourth stone was lifted the heaviest load placed upon the derrick did not exceed eighteen hundred pounds. Cole, the superintendent, places the maximum weight prior to lifting the heavy stone at twenty-six hundred pounds. This conflict in the evidence under the rule fixes the maximum weight at eighteen hundred pounds. Two witnesses at least swore that the fourth stone which caused the accident weighed five thousand pounds, and that it caused the boom to swing out from six to fifteen feet beyond the side of the car and resulted in tipping it over. Cameron, testifying on behalf of the plain-

tiff, swears that he never knew, prior to that day, of this derrick lifting a weight exceeding eighteen hundred pounds at any one time. This, of course, stands as a fact in the case. It is also a conceded fact that this derrick car was constructed about six months before the accident and the use of it had not been continuous during the interval. There is evidence on behalf of the plaintiff that would place the total use at a very few days. It is clear, under the rule in plaintiff's favor, that this accident was caused by an attempt to raise a weight more than double any single load elevated by the derrick prior to that time.

There is also an additional fact which under the rule can be considered a factor in producing this accident. It appears that when the third stone was raised it revolved and twisted the tackle so as to impede somewhat the hoisting apparatus. When the fourth stone was attached to the hook of the derrick a tag line was fastened to the stone and held by Cole, the superintendent, standing on an embankment some twenty-five or thirty feet above the bottom of the ravine. Two witnesses at least testified that pulling on this line, with the object of keeping the stone from revolving, had a tendency to increase the weight on the boom to some extent. In other words, the effect was to increase the strain upon the boom caused by the great weight of the stone. This fact must be assumed in plaintiff's favor.

The defendant states in point fourth of its brief in this court, in arguing the contributory negligence of the intestate, that he could have prevented the boom from swinging out when the stone weighing five thousand pounds was being hoisted, as nothing broke or gave way ; that the boom gradually swung out as the stone was being raised until finally the engine "stalled" and the car tipped over. I have already pointed out that Cameron, the foreman working on the gondola car, testified that the intestate was at his wheel when the last stone was being lifted. He said : " I saw Wagner start for the door of the car as she tipped." The inference from this testimony is that the intestate remained at his post of duty until the moment the car began to tip when he evidently sought safety in flight.

34

A witness for plaintiff named Trinder, who gave his business as hoisting engineer of the Kings Bridge Company, which built or assisted in building the completed bridge on which the derrick car was working on the day in question, witnessed the accident and testified as follows in regard to lifting the fourth and heavy stone: "As to what I observed in regard to the hitching onto and lifting of this stone, when I got there the engine had just started working, the boom stood facing Buffalo, as we called it, the east there; you have been calling it Buffalo here; facing down the track; as the engine started to move the stone started to rise, but from where I was I couldn't see the stone yet; it came up to where I could see the top of the stone; and I noticed it kind of stop, and the engine looked from where I was, the exhaust, it looked as though it was dying again, the exhaust, steam from the engine" (witness had previously testified that the engine "stalled" and stopped in raising the third stone); "it went kind of 'shoo,' as if it was choking off, and the stone stopped; I could just see it from where I was. As the stone came down their car tipped over a foot to eighteen inches off the track, and as the stone raised up again the car settled back, and the boom had been swung out in the meantime; and Mr. Cole stood off about from fifty to seventy-five feet from this track with the tag line in his hand, holding this stone, naturally pulling it to him to steady it. * * * The boom was standing towards Buffalo, and as it got about here, at an angle of about forty-five degrees, it had sprung down and tilted the car, and kept working out, going by jerks; it kept working out by jerks. * * * Cole hollered two or three times for Nick to pull in the boom; he didn't pull in the boom; it kept going out. It got around pretty near at right angles with the tracks and the car went over. As the stone swung down the second or third time it took the car right over with it. The engine stayed stopped. * * * It was not possible with this derrick and appliance as I have described it, with the engine stopped, for Wagner to swing in this boom when told to by Mr. Cole."

This is the testimony of a disinterested witness, and under the rule the plaintiff is entitled to the most favorable infer-

ences to be drawn from it. It is clear that this weight, more than twice as heavy as the derrick was ever subjected to, caused the engine to stop shortly after the hoisting began. The vivid description of this trained engineer shows precisely what happened. The great weight proved too much for the power of this engine, which was described by one of the witnesses as a four-horse power; the steam ran down and the engine stopped; the intestate was then powerless to operate the boom; and it is a fair inference that he could not have done so with the great weight of the stone if the engine had been working. What then happened was that the stone began to descend by "jerks," as the witness put it.

It remains to consider whether Isaac Cole, the superintendent of defendant on the work in question, was its *alter ego*. If he was it will render unnecessary the consideration of some questions that would otherwise be material. Mr. Cole was sworn by the defendant, and testified in an honorable and straightforward manner, apparently without being swayed by the fact that he was still in the employ of the defendant, and that his testimony might have a serious effect on this case. He swore that he was the supervisor of bridges and buildings on the eastern division of the defendant, and that his division included about two hundred and forty-five miles from Buffalo to Bellevue. He further testified: "I have been on with the 'Nickel Plate' since the spring of 1884. * * * I have been supervisor for the 'Nickel Plate' people about sixteen years. * * * In the performance of my duties I go anywhere between Buffalo, N. Y., and Bellevue, Ohio. Under me I have four or five gang foremen with all their gangs; they report to me and I in turn report to the chief engineer of the division; I was at Idlewood on this day that Mr. Wagner was killed. I am familiar with this derrick car. I had it built under my instructions. It was built about six months prior to the accident, the accident occurring on the 16th of April, 1901." After having testified at length in regard to the construction of the derrick car and the details of the accident, he said: "We did not have the car anchored because I thought it was unnecessary. In my judgment I did not regard it necessary to anchor the car. Had I

deemed it necessary I could have anchored the car. There were appliances there to anchor it at that particular time. * * * I knew that the car wasn't anchored and whatever necessity there was for anchoring it I fully understood." He also testified that he was in the shanty of the derrick car all the forenoon, and that later he went down to supervise the fastening of the hoisting hooks to the heavy stones; that he used in that work the chain that was employed for anchoring the car. Cameron, the foreman, testified for plaintiff in this connection that he was foreman of the carpenter gang engaged in this work, and that the intestate was a member of his gang; he further testified that the intestate had worked under him for nearly eight years.

We thus have the undisputed evidence that this gang of workmen were in charge of a foreman, and over him was the supervisor of bridges, who had under him four or five foremen with all their gangs, this being one of them. Under these circumstances to hold that Cole was a fellow-servant of the intestate is to ignore all the evidence in the case bearing on the point. The presence of Cole on this work is to be accounted for on no other theory than that he was there in full control, and the inference is that this was the regular work in which he was engaged with his five separate gangs. As above pointed out, he spent the morning in the shanty of the derrick car; he had no other duty to perform there except to superintend the work from that point, and had every opportunity to anchor the car if he deemed it necessary. This gang of workmen had their own foreman (Cameron), and it is undoubtedly true that if it had been Cameron's duty to anchor the car and he had failed to do so, although in possession of appliances for the purpose, it would be the negligence of a fellow-servant and a detail of the work which would not charge the master. (*Vincent* v. *Alden*, 75 App. Div. 615; affirmed without opinion, 177 N. Y. 545; *Vogel* v. *American Bridge Co.*, 180 N. Y. 373.) We, however, have here no such situation. Cole frankly admits that he knew the car was not anchored and had not been anchored because he deemed it unnecessary. His act in this connection was the act of the master, and if he failed in exercising good judg-

ment under the circumstances, it was the failure of the master to properly protect the men employed. There is evidence in the record which would seem to justify the conclusion reached by the superintendent that during the forenoon there was no necessity for anchoring the car; that the work had gone on smoothly and loads weighing nearly a ton were raised without disturbing the equilibrium of the derrick car. Be that as it may, the plaintiff is entitled to insist, *first*, that the necessity for anchoring the car was to be determined by the superintendent in charge, and if the superintendent had so ordered it would have been the duty of intestate to obey if appliances were at hand; *second*, that under the rule of directed verdict she is entitled to have it stand as a fact in this case that no appliances were furnished intestate that day even had it been his duty to anchor the car; also, that it was no part of his duty to see that it was anchored. It is not contended that intestate rested under the duty of anchoring the car, but that he assumed the obvious risk.

It may be observed in this connection that the intestate could not be reasonably held to determine whether the car should be anchored or not, when the place that he occupied in working is recalled. He was in the shanty seventy feet above the place where loads were attached to the hoisting apparatus and obliged to constantly operate the wheel when the derrick was working. It was impossible that he should know what was going on below; he was an ordinary laborer assigned to the duty of craneman on the derrick car, and had no knowledge whatever of the weight the derrick would be required to lift from time to time. The claim is not made that Cameron, the foreman, was obliged to anchor this car; in fact, there is no evidence to that effect, and, consequently, the question of the negligence of the foreman is not presented at this time. The undisputed evidence shows Cole to have been the superintendent, the vice-principal of the defendant in charge of this work, and the sole duty devolved upon him to determine at what time the derrick car should be anchored. If he failed in the discharge of that duty his negligence was that of the master.

This distinction between superintendent and foreman or

boss is recognized by the Supreme Court of the United States in *Northern Pacific Railroad Co.* v. *Peterson* (162 U. S. 346). At page 355 Mr. Justice PECKHAM said : "When the business of the master or employer is of such great and diversified extent that it naturally and necessarily separates itself into departments of service, the individuals placed by the master in charge of these separate branches and departments of service, and given entire and absolute control therein, may properly be considered, with respect to employees under them, vice-principals and representatives of the master as fully and as completely as if the entire business of the master were placed by him under one superintendent. * * * (p. 357). This boss of a small gang of ten or fifteen men, engaged in making repairs upon the road wherever they might be necessary, over a distance of three sections, aiding and assisting the regular gang of workmen upon each section as occasion demanded, was not such a superintendent of a separate department, nor was he in control of such a distinct branch of the work of the master as would be necessary to render the master liable to a co-employee for his neglect."

In *Alaska Mining Co.* v. *Whelan* (168 U. S. 86), where it was sought to hold the foreman or boss of a particular gang for negligence, the head note reads : "Where the business of a mining corporation is under the control of a general manager, and is divided into three departments of which the mining department is one, each with a superintendent under the general manager, and in the mining department are several gangs of workmen, the foreman of one of these gangs, whether he has or has not authority to engage and discharge the men under him, is a fellow-servant with them, and the corporation is not liable to one of them for an injury caused by the foreman's negligence in managing the machinery or in giving orders to the men." Mr. Justice GRAY, writing the opinion of the court, said : "Finley was not a vice-principal or representative of the corporation. He was not the general manager of its business or the superintendent of any department of that business. But he was merely the foreman or boss of the particular gang of men to which the plaintiff belonged." This decision follows *Northern Pacific Railroad*

*Co.* v. *Peterson* (*supra*); that is, that it is the negligence of the superintendent, and not the foreman or boss, that charges the master.

As to the duty of the defendant to furnish a safe place in which the intestate was to work, the Appellate Division held that the derrick car was an appliance rather than a place in which he was called upon to work, and that he assumed the obvious risks. I am of opinion that whenever it was necessary for the intestate as craneman to work upon the derrick car, it was in law the place furnished by the master, and the risks that a servant assumes are those only which occur after the due performance by the master of those duties which the law enjoins upon him; that under the established facts in this case as now presented, it was the duty of the master, by its vice-principal Cole, who was superintending the work, to see to it that the derrick car was from time to time anchored as the exigencies of the case demanded. To this extent the defendant was bound to make the derrick car a safe place in which the intestate was to work, and the law of assumed risks does not apply to the anchoring of the car under the circumstances disclosed.

At the close of all the evidence the defendant moved for a directed verdict on ten separate grounds, but before the decision of this motion the plaintiff asked to go to the jury upon all the grounds and all the evidence in the case; upon the question of the negligence of the defendant; upon the question of freedom from contributory negligence on the part of Nicholas Wagner, deceased, and also upon the question presented of the assumption of risk by the deceased raised by the defendant's counsel.

I am of opinion that on the condition of the record as now presented, under the rule of directed verdict, the questions of defendant's negligence, of intestate's freedom from contributory negligence, and all the other issues in the case, should have been submitted to the jury.

The judgment and order appealed from should be reversed and a new trial ordered, with costs to the appellant in all the courts to abide the event.

Vann, J., concurs.